McCaleb et al. *v.* Pradat.

---

CHARLES E. McCALEB et al. *vs.* PIERRE PRADAT.

L. sold to D. a certain portion of a tract of land, but reserved a part of the tract to himself; in describing the boundary of the land sold L. used in the deed the words, "and the west by the property of the seller." *Held*, that these words refer to the portion of land reserved by the vendor, which is now in controversy.

22 *

It is competent to show by parol evidence, where the boundary lines of land have been fixed by the parties; and in the same manner, to identify lands referred to in a written instrument.

It is not a valid objection in a court of equity, that the conveyance of land by the agent of heirs, is not done under seal, and is not signed with the names of the heirs; but this objection might be maintained in a court of law.

Though not under seal, the conveyance gives a good equitable title on its face.

It is one of the usual powers of a court of equity, to correct a defective execution of a power, so as to effect the object designed by it.

On appeal from the southern district chancery court at Mississippi city; Hon. James M. Smiley, vice-chancellor.

This was a bill filed in the southern district chancery court, and states, that in 1815 Jaques Maturin Ladner was in possession of, and claimed to own, twenty-five arpents of land, in then county of Hancock, Mississippi, bounded north, south, and east, by the bay of Biloxi, and west by a claim known as the Dorsette Richards claim. A negotiation then took place between Ladner and George Ball Dameron for the sale of twenty arpents, part of the twenty-five, and Ladner agreed to sell and convey to Dameron, and did, in consideration of $600, sell and convey to said Dameron said twenty arpents, bounded as follows: south by bay of Biloxi, east by bay of Biloxi, north by bay of Biloxi, and west by the property of said Ladner, the seller. Copy of the deed referred to. That the land said in the deed to be that of the " seller," (the western boundary,) was five arpents, which was reserved, and on which Ladner and family then resided, and continued to reside, until his death ; that the said five arpents were surveyed and laid off at Ladner's request, and the line marked in the presence of Dameron, who at all times recognized and admitted the five arpents to be the property of Ladner; that some time prior to 1832 Ladner died, leaving his heirs, Jacques Ladner, Dominique Ladner, John Ladner, and Catharine Fornier, wife of Andrew Fornier; that afterwards, in 1832, said heirs duly authorized Louis A. Caillavat to sell and convey the five arpents, by power in writing sealed.

That in 1832, pursuant to said power, Caillavat sold the five

McCaleb et al. *v.* Pradat.

arpents to complainant for $800; that said Caillavat attempted to convey to complainant, but the writing was not sealed, and was in his own name.   Complainant was put in possession of said five arpents, and made valuable and lasting improvements; that said heirs, except one, are dead.   Dominique left an heir named John B. Ladner; Jacques left heirs; Louis Ladner; Ursene Ladner; Ulalie Faboe, wife of. Faboe; Mariolde Farva, wife of Toussant Farva, and Matilda Ladner.

That Charles E. McCaleb, claiming under the deed from Jacques Maturin Ladner, obtained a patent from United States for said Ladner land, including the five arpents; and they threaten to sue for its recovery, although they knew complainant claimed; that McCaleb paid nothing for said five arpents; McCaleb and Ladner's heirs are made defendants, and prayer that complainant's title be quieted, and the legal title conveyed, and for general relief.

McCaleb answers, that he is son of Thomas F. McCaleb, who died in 1832, testate.   Copy of will to be produced, &c. Admits that his father derived his title under the deed from Jacques Maturin Ladner to George Ball Dameron; admits the boundary is correctly stated in the bill, and that the Ladner claim was next to that of Dorsette Richards, and has been validated by United States as a valid donation for settlement. But they had no ascertained and established boundaries, and were not " donated" to Maturin and Richards, until the act of 3d March, 1819, and not surveyed and bounded until several years afterwards, say from 1822 to 1824.   They were made under the Spanish government, which continued in possession until 1813, when forcibly displaced by that of United States; admits that where settlers sold before confirmation, the right of purchaser to hold and represent claimant was recognized, but all private and unauthorized surveys were, by acts of 1804 and 1807, prohibited.   With respect to land sold by Maturin to Dameron, he protests against parol .evidence to contradict, explain, or vary the deed.   The land sold wa  bounded by water except on the west, and was known by tne name set forth in the deed as the *Point à Cadet,* or *Point à Cady* tract; it is in the deed represented to have twenty arpents front, which

means the south front of the settlement, on the gulf of Mexico, more usually called the front bay of Biloxi. The twenty arpents represented .as the front was a conjectural estimate, the land not having been surveyed, and could not be sold by specified boundary, not having been confirmed or surveyed; denies that the five arpents were reserved, or intended to be reserved, in the sale to Dameron, and denies that a survey was made indicating such reservation; admits that Ladner *did*, after the sale, cause the five arpents to be laid off; does not believe it was done in Dameron's presence, or if so, not by his agreement or approbation; if it was, no such agreement or contract was in writing, and relies on the statute of frauds; that after confirmation by congress, Ladner in 1822 quietly moved off and abandoned his claim; that then Dominique Ladner, his son, after the death of Maturin, took possession; admits notice of Dominique Ladner's possession at the time of his father's purchase, but D. Ladner was a trespasser on the government, and his possession of no avail; denies that Dameron and his father did not make claim to the land in controversy; the whole front, up to Dorsette Richards, is but twenty arpents front, including the five arpents; relies on the public survey as conclusive of this; admits that complainant had made considerable improvements, but with notice of his claim. A supplemental bill alleges, that McCaleb has obtained a judgment for the land, and prays an injunction. An injunction was granted, and issued duly.

The bill was duly taken for confessed against Ladner's heirs. Upon proof, the chancellor made a decree in favor of Pradat, from which the defendants appealed.

*John Henderson*, for appellants.

The bill admits all the heirs of Ladner are dead but one, and it seeks a title from the heirs by decree. He who comes into a court of equity to get rid of a legal title overshadowing his own, must show his own clearly. 10 S. & M. 62.

It is charged in the bill, that Caillavat executed a conveyance of the land in controversy to complainant in his own name, and without his authority as agent being under seal.

McCaleb et al. *v.* Pradat.

This is an admission that the title to Pradat is good for nothing. He shows no contract signed by the party to be bound. 5 Pet. 349; 6 Ib. 349. The deed from Caillavat bound only himself. Equity may compel parties to execute their agreements, but does not make agreements for them. 1 Story, Eq. § 115.

An agreement reduced to writing excludes proof of a previously different parol authority. 1 Johns. Ch. R. 273; 1 Pet. 598; 6 Ib. 366; 1 Ves. Ch. R. 402, 403; Ib. 333; Walk. 115; Freem. Ch. R. 53. The survey made of the land was a private one, and not binding on the heirs. Land L. U. S. 114, § 14; Ib. 156, § 1; How. U. S. 447; Ib. 169; 6 Pet. 675, 676.

*Mayes* and *Clifton*, for appellee.

There is one question of fact, which is, what was meant by the words "bounded on the west by the lands of the seller?" The evidence is so full, that remark is needless. There is made this question of law. Is parol evidence admissible to show that only the eastern twenty arpents were sold? The opinion of Chancellor Kent in *Gillispie* v. *Moon*, 2 Johns. Ch. R. 589, and authorities cited, are full to this point. See also *Dunlap* v. *Stetson*, 4 Mason, C. C. R. 349.

The point is made, that the contract of sale was signed by Caillavat, the attorney in fact, and not by Ladner's heirs. See *Vanada's Heirs* v. *Hopkins's Administrators*, 1 J. J. Marsh. R. 295, 296.

Mr. Justice YERGER delivered the opinion of the court.

The questions presented by this record for consideration are rather of fact than of law. The subject of litigation is a tract of land situated in the county of Harrison, fronting five arpents on the bay of Biloxi. Both parties trace their title to Jacques Maturin Ladner, who was an actual settler on a tract of land known as the "Point á Cadet" tract, and entitled to it as a donation by virtue of an act of congress passed in reference to actual settlers in the territory, at the date of its acquisition by the United States. The bill alleges, that the "Point á Cadet" tract contained, originally, twenty-five arpents front on the bay

of Biloxi, and that on the 10th day of November, 1815, Ladner sold and conveyed to George B. Dameron a portion of this tract of land, containing twenty arpents front, and reserved for himself the remainder, containing five arpents front, being the land in controversy, and on which his dwelling-house was situated at the time of the sale. A copy of the deed from Ladner to Dameron accompanies the bill, by which he conveys to Dameron " the tract of land known by the name of the Point á Cadet, containing twenty arpents front, bounded on the south by the bay of Biloxi, east by the bay of Biloxi, north by the bay of Biloxi, and west by the property of the seller." The bill avers, that " the property of the seller " referred to in this deed, as the west boundary of the tract sold, is the five arpents in controversy. The bill further states, that after this sale Dameron sold his portion to a man named Garrow, who sold the same to Thomas F. McCaleb, the father of appellant Charles E. McCaleb ; and that Charles E. McCaleb, pretending that the sale to Dameron embraced the entire tract owned by Ladner, had obtained a patent from the United States embracing the whole tract, as well the five arpents reserved as the part sold to Dameron.

The bill further states, that after the sale to Dameron a line was surveyed and marked out, in the presence and at the request of Dameron, for the purpose of dividing the twenty arpents sold to him from the five arpents reserved by Ladner ; and that Ladner, from the period of the sale, continued to reside on the five arpents till his decease ; and that after his decease, his children were in the occupancy of it till the year 1832, when they sold it to complainant, who has had possession ever since ; and that Dameron, during the lifetime of Ladner, always recognized his title to the five arpents, and never pretended to assert any title thereto.

The answer of McCaleb admits the sale from Ladner to Dameron, and the conveyance by the description stated in the bill, but denies that Ladner reserved any part of the tract to which he was entitled as a donation ; and avers, that the sale embraced the whole tract to which he was entitled, including the five arpents in controversy. It alleges that the words,

" the property of the seller," used in the deed, had reference to a small tract of land lying west of the land sold to Dameron, on which one of the sons of Ladner then resided, and to which Ladner then made claim, but which has since proved to be a part of the Dorsette Richards tract.

It will thus be seen, that the controversy is narrowed down to this question: Did Ladner, in the deed to Dameron, intend to designate the five arpents in dispute, by the words " the property of the seller," which was given as the western boundary of the tract sold. In our opinion, the testimony fully shows that he did.

Augustine Fayard proves, that in 1815, Jacques Maturin Ladner owned a tract of land near Point à Cadet, bounded on the south by the Gulf of Mexico, north and east by the bay of Biloxi, and on the west by lands supposed then to belong to John Ladner, but which were since recovered by Dorsette Richards. At that time Jacques Maturin Ladner resided on the southeast corner of the land, near the present residence of Pradat, and near the line of Dorsette Richards's tract. His son, John Ladner, then claimed the land lying on the west, which is now a part of the tract known as Dorsette Richards's.

This witness further proves, that from his first remembrance Ladner resided at this place, and continued to reside there till 1818 or 1819, when he removed. One of his sons, named Dominique, continued after his removal to reside there till the sale in 1832 to Pradat, when possession was delivered to him and he has continued to reside there ever since. This witness heard Dameron say, in 1818 or 1819, that Ladner's tract contained twenty-five arpents front; that he had bought twenty arpents, and that Ladner reserved five arpents front on the western side. He did not see the land surveyed, but saw the lines after it was surveyed, and thinks there were more than five arpents west between the line marked as the boundary of the land sold and the land claimed by John Ladner. On these five arpents is Pradat's residence, and on them was the residence of Ladner when he sold to Dameron. His house was near the centre of the five arpents, and one of his sons hired on the eastern part, near the line, for a year or two. He never knew Ladner

to claim any other tract of land than the Point à Cadet tract, and after the sale to Dameron, in 1815, till the sale to Pradat, in 1832, Ladner, or some one of his sons, always lived on the five arpents, claiming it as their own.

Louis A. Caillavat proves substantially the same facts, and also, that Elihu Carver, in 1815 or 1816, ran a line, dividing the twenty arpents sold to Dameron from the five arpents reserved, and that Ladner and his sons then resided and continued to reside on these five arpents from the sale to Dameron, in 1815, till the sale to Pradat, in 1832, which sale was made by witness as the agent of Ladner's heirs. Dameron built a house on the part purchased by him. He resided four or five years after the purchase in Biloxi, and witness never heard him claim the five arpents on which Ladner lived; but heard him frequently say, that he only bought twenty arpents, and that Ladner had reserved five. Elihu Carver proves, that he was county surveyor of Hancock county in 1815, and that in that year, at the request of Dameron, he ran the west boundary line of the tract sold by Ladner to Dameron. This line divided the twenty arpents sold from the land reserved. The land reserved was five arpents, immediately west of the line he ran between it and Dorsette Richards's tract. At the time the line was run, there adjoined the five arpents on the west, a tract of four arpents then claimed by John Ladner, a son of Jacques, but which four arpents were embraced by Dorsette Richards's claim, and are now a part of it.

John J. McCoughn and B. A. Ludlow were appointed to make a survey of the lands in controversy since this suit was commenced. They state, that Carver went with them and pointed out the lines of the survey which he said was made by him in 1815. This line divided the five arpents in controversy from the remainder of the Point à Cadet tract, and seemed to be an old line, between twenty and thirty years old. After Carver had shown them the beginning of the line at one corner, he did not continue with them, as they ran it out, but rode round to the other side of the tract, and when they reached that end of the line they found him at it. From their testimony, it would seem, if we allow for the diminution in quantity caused

McCaleb et al. *v.* Pradat.

by the washing away of the point as proved by the witnesses, that the Point á Cadet tract originally had in it about twenty-five arpents, as there seems now to be a little less than twenty arpents front lying east of the line ran by Carver, and a little less than five arpents west of that line, between it and Dorsette Richards's tract.

Another witness, named Claude Ladner, proves, that after Dameron's purchase he built a house and resided in it on that part of the land he bought east of the five arpents in controversy; and that Ladner, during the same time, resided on the five arpents; and that Dameron did not make or set up any claim thereto.   The defendant has no testimony which rebuts the positive testimony of complainant, proving that Ladner always claimed to have reserved the five arpents in controversy; that Dameron admitted that fact; that Carver ran a boundary line between the part sold and the part reserved, with the knowledge and at the request of Dameron; and that Ladner, at the time of the sale, resided on the five arpents, and continued to reside there afterwards, claiming it as his own, till 1818 or 1819, when he removed, leaving one of his sons in possession, who continued to reside there, claiming it as the property of the family till the sale to Pradat in 1832.

We have been unable to find in the record, proof to sustain the suggestion, that, in using the words "the property of the seller," Ladner had reference to the four arpents on the west of the Point á Cadet tract, which subsequently were found to be included in Dorsette Richards's tract.   All the evidence in the record shows that these four arpents were claimed by John Ladner, his son, and not by Jacques Maturin; and as there is no proof that Jacques Maturin ever made any claim to them at any time, we cannot suppose he referred to land as his own property, "the property of the seller," on which he never lived, to which he never made any claim, and which was at that very time claimed by, and in possession of, his son John.   The only part of the testimony which gives any plausibility to the suggestion is contained in the deposition of Carver, in which it is said, "two families lived on the part excepted; the old man Maturin and his son Jacques, who lived adjoining on the Dor-

sette Richards claim." It is said, that these words show that the part excepted was a part of the Dorsette Richards claim. The expression is somewhat ambiguous; and if we were to give it the construction insisted upon by the counsel for the appellant, it would conflict directly with other portions of the same deposition of the witness, as well as the testimony of all the other witnesses of complainant, who prove expressly, as we have heretofore shown, that Jacques Maturin lived at the time of the sale to Dameron, and continued to reside long afterwards, on the five arpents near the present residence of Pradat. The fact that his residence was there, is shown very clearly in a letter written by Dameron to Thomas F. McCaleb, in 1831, in which he states that Dominique Ladner, who then resided on the land in controversy, lived where his father lived at the time of the sale and afterwards. The language of the letter is as follows, and is important in showing, that, after the sale to Dameron, Ladner claimed the land in controversy, and had it surveyed. After stating that Ladner did claim a part of the tract of land as reserved by him, it proceeds, " of his own accord he made an imaginary line between where Dominique Ladner now lives, and which was where he then lived himself, and the tract he sold me, as I suppose that he thought would include the quantity that he sold me."

This letter of Dameron establishes three things, which strongly corroborate the testimony of complainant. It shows, first, that Ladner resided on the land in controversy after the sale to Dameron. Second, that he claimed it as his own ; and, third, that a line was run out and surveyed, dividing it from the remainder of the tract. As it clearly appears that Ladner never resided on the Dorsette Richards tract, we cannot suppose that Carver intended to contradict a previous statement made by himself to that effect. If, then, he was not mistaken in the fact, that Jacques Lardner as well as his father lived on the land reserved, we must suppose that he used the words " adjoining on " as synonymous with the expression " adjoining " or " adjoining to," in which sense, among the illiterate, they are not of uncommon use.

Upon a careful review of all the evidence, we have been un-

able to reach any other conclusion, than that Ladner, when he sold to Dameron, reserved a part of the tract, and that by the words, "the property of the seller," he referred not to the Richards land, but to the five arpents in controversy.

We cannot see how the statute of frauds can be made to apply to this case. The sole question presented by the record is one of boundary and identity. And there certainly cannot be a rule more fully settled, than that it is competent to show by parol a boundary line has been fixed by parties, and to identify, in the same manner, the lands referred to in a written instrument. It was, therefore, in our opinion, perfectly competent to show by parol what lands were referred to by the words, "the property of the seller," and which constituted the western boundary of the tract sold. 4 Rawle, R. 130.

The objection, that the conveyance by Caillavat, the agent of the heirs of Ladner, is not under seal, and is not signed with the names of the heirs, but only by the agent, might be maintained in a court of law, but cannot avail the defendant in this court. Though not under seal, it gives a good equitable title, and on the face of it, it shows that the party was acting as agent for the heirs, and intended to sell their interest. It is one of the usual powers of a court of equity to correct a defective execution of a power, so as to effect the object designed.

Let the decree of the vice-chancellor be affirmed.